On calendar is Porter v. Gore, 21-55149. In this case, each side will have 15 minutes. Good morning, actually, it's the Court. David Loy for Susan Porter. I'm here with Michael Ju, also representing Ms. Porter. I'd like to serve about five minutes of rebuttal, and I'll watch the time at the podium. Every day, people leap their boards to express themselves personally or politically, especially when public health restrictions foreclose other means of assembly, protest, and expression. The District Court erred, upholding a ban on the most common form of expression in all circumstances, regardless of time, place, or volume. If the Court has no questions, by any other agenda briefs, I'll focus initially on the merits. On the merits, a near-total ban on expressive form. I have one final question. Yes, Your Honor. There's some reference to manila liability, and we need to revise that. I don't want to spend much time on this, but this is not a damages case, so is there any manila liability question? Well, Your Honor, under the Supreme Court decision, if a man in L.A. carrying a swine freeze, manila creditors must be satisfied for prospective relief, as well as damages. But that's for doing local government, and here is an official suit in his official capacity, so I don't understand why manila is being discussed either. Well, I would gladly accept a ruling that I don't need to satisfy. I should not be ruling that. It makes no sense. It's an expediting health problem. Maybe it's the wrong person, but it's not a manila problem. Why don't you move on? I just wondered why you thought that. Well, there are two defendants. There is the state agency defendant, the commissioner of the highway patrol, in her official capacity. There is no manila requirement as to the state official, but the sheriff is a defendant in her official capacity, and the sheriff in her official capacity, as I've always understood, is candidate to the county itself. But in any event, the district court did not reach that issue. I know. I'm just wondering why. While we're talking about who was who, if you were to win this case, would all law enforcement officers in the state be bound by our ruling or the district court's ruling? I'm confused about how you're going to get relief against local police by suing the two defendants who you sued. Well, I've sued the agency that cited my client, and I've sued the highway patrol because the highway patrol was specifically charged with enforcing the vehicle code for an expired vehicle. Now, the defendants bound by the injunction and liable to potential contempt for enforcement are those defendants. Now, obviously, I expect all agencies would follow the law as established by this court, but to correct that, you know, we're not seeking injunction against, say, every police department in the state. So say you win, would your client still be chilled because she would worry that the L.A. police will, the LAPD will cite her or the San Diego PD or whoever else she might be driving through? I presume those agencies would meet this court's decision as moderate, and if they gave the indication that they would not, there might be separate proceeds against those agencies for separate litigation. So if that's true, why sue two defendants? Like, I'm confused about, you know, if you really only need one defendant, then do we – is that your position, that you can just do one defendant and that decision will be binding on everyone, regardless of who you choose as a defendant? Well, we expect agencies will follow the law as established by the court, but for procedural purposes, the sheriff is the agency that cited Ms. Porter and confirmed his policy of continuing to enforce. CHP, under Ms. Pardee Young, is the agency and the agency official that is directly charged with enforcing the vehicle code. And, you know, on the understanding that, you know, the Monell predicates might need to be satisfied as a sheriff over official capacity, Ms. Tietema to the agency, we wanted to be sure that there was a party. It is unlikely that Monell would apply or Monell predicates were not satisfied, that we had a ruling on the merits from this court binding the state official, the commissioner in her official capacity, who is charged by state law specifically with enforcing the vehicle code. When you talk about state law in that regard, are there state cases that say that if you want to invalidate the provisions of the vehicle code, you do that by suing CHP? It's not a question of state law, Your Honor. It's a question of Ms. Pardee Young's doctrine. This was not briefed by the parties. I'd be glad to spell this out for you. The district court did find in a footnote in the decision, CHP commissioner was a proper defendant in her official capacity. And I don't doubt that as a question, it's just what the scope of release would be. Because it affects standing, because she'll still be chilled because you haven't sued enough people, and it could affect her stress ability. Her stress ability is satisfied at a minimum for Article III purposes, even by partial remuneration. So, you know, she is chilled by the actions of CHP. The record shows CHP enforces the vehicle code and thus so aggressively enforces the statute. The record shows the sheriff enforces the statute and enforces it against her specifically. And so she is chilled by those agencies' enforcement, those the agencies have chosen to sue. If other agencies, you know, manifest a similar kind of enforcement, they might be subject to liability. And the scope of the remedy, the geographic scope, the precise substance of the injunction before the district court to determine on the remedy, would it run statewide or countywide, would it run, you know, as only to protest or to all expressive court use. Those are remedial issues that we never got to because the judge, district court, raised a separate judgment on the merits. And so we've named the agency that cited Ms. Porter and expressed the intent to continue enforcing the statute against expressive court use. CHP, under Ex parte Young, is a proper defendant because the commissioner is the state official charged by law with enforcing the vehicle code in their own court case. So it was testified that they enforced the entire vehicle code in Section 27.111, and they enforced the vehicle code aggressively. Ms. Porter specifically testified to a concrete fear of enforcement by CHP if I were driving down the freeway and I saw someone with signs that said, support our troops, I would not talk because I know CHP could pull me over. That's why we sued these agencies under this law. Not every agency in the state needs to be sued to indicate a transgression of their rights. Can I ask you, as long as we're on this subject, what do you want this injunction to say? Well, if we were before the district court, you know, we would be asking for an injunction that protects our client's rights to safeguard the vehicle code. No, not to protect. I mean, it would help me in dealing with the underlying issues to know exactly what you want. We want to enjoin the agencies from enforcing this statute as applied to expressive foreign use in the context of protest or otherwise for the district court. So, but you said two different things. I agree with the district court on that. It's helpful to know if I'm going to testify because I know that this is backwards. You said expressive contact in the context of protest. Do you mean, would it be, therefore, limited to protest? I mean, at other points in your briefs you seem to be saying it seems right that if somebody asks in front of somebody's house to come out and ask for some contact or if somebody is, there's a question, is everybody, you know, going down the street weeping? In other words, how far would the injunction go if the injunction is limited to protest or political messages? Your Honor, we would ask ultimately for an injunction that prohibited enforcement against all expressive conduct through use of a vehicle form. I think that would be our initial position because we think that's supported by the laws of the record. If the district court chose to limit it more narrowly for concerns about workability or enforcement, we would address that in the briefs and the district court would decide that in its discretion based on the record of evidence. Our position as plaintiffs is that, yes, the First Amendment would prohibit the enforcement of this statute against all expressive horn use vehicles. At that point, are you invalidating the whole law? If it's gone, does anyone can use their horn for anything? Because either it's for traffic or it's for expression. If you can use it for both, there's no restriction on horn use. Not necessarily, Your Honor, so two points. The statute requires sounding a horn to give a warning, and we don't dispute that that's appropriate for traffic safety. Second, there could be instances where the use of a horn is not immediately clear to an observer or reasonable observer that it is expressive, in which case the statute can still be enforced. Can you give an example of what you're talking about in that one? There could be certain instances where someone is driving down the street and just standing on their horn, and there's no evident message being conveyed to a reasonable observer because there's no protest to correct. There's no threat that responds the way. There's no political campaign. There's simply no – Maybe they're just really angry and they're expressing their anger. That's entirely plausible. The test for expressive conduct is twofold. There has to be subjective intent to convey a message, but a great likelihood that it is understood by observers in context. Well, what you're just saying, there are a couple of things, first of all. You're talking to friends on the street, but that's making noise. That's not part of a protest. Noor, by the way, was – she's driving on a highway and she neglected and she came across a sign supporting veterans, and she didn't hop because she was afraid that she would be stopped by a police officer and given a ticket, which I think is a good thing. That was so good, but she wasn't protesting that. According to her, she was honking her horn because she agreed with the sign. Well, that is an example of how she's hearing this, how she would be an enforcer against her and why her speech is being shiveled. And – Well, I think that – I mean, given an incident, the underlying incident, she was honking to show support for the protesters, not to protest as such. So it isn't that – you're not saying it's only honking as a protest. It's honking to support a political or a position, essentially, is what you mean by protest. In order to – it's not that she was trying to – she was supporting the protesters is what she was doing. That's correct, Josh. She was supporting the protesters when she was cited. In the example she gave in her testimony, she would be expressing support for methods that said support for troops in both contexts. Let me add a couple of really interesting and complicated things. There's a whole lot of discussion here of whether it's content discrimination or not. Is that ultimately a matter? I.e., as to whether the statute itself has – what it definitely applies to. I mean, in – whether the honking the horn for safety purposes is itself a speech. Does it matter whether or not that's true or not for the ultimate case? Well, if I understand your question, Your Honor, the court can decide in this case without reaching the issue of content discrimination. Right. Because I don't think defendants – our position is defendants have not met their burden under intermediate scrutiny. Right. So if we agreed with that, we would not need to reach the content discrimination issue. That's correct, Your Honor. It can be decided on either basis. Do you want to talk then about that intermediate scrutiny standard and how it applies here briefly? I hope I can give you a little more time because it's a very complicated case. Thank you, Your Honor. I'll take whatever time is available. I'll make sure I have some time for rebuttals. I appreciate the court's courtesy. Even if that is the content issue, it fails intermediate scrutiny because the defendant did not carry their burden to justify a near total ban on express authorities in all circumstances, regardless of the time, place, or volume. Intermediate scrutiny is rigorous. It's not a blank check. The district court effectively downgraded it to rational basis review. Defendants are interested in protecting traffic safety and preventing excessive noise, and those may be – That's basically – you may have a little bit of a record on it, but you don't want to take it yet, potentially.  That's correct, Your Honor. The defense has proved that express authorities in fact jeopardize their interest in the real world, and as to traffic safety, they did not cite, document, or produce a single fact from a single source. Why isn't the crying wolf theory just obviously the purpose here, though? If people are honking all the time, then no one will pay attention to honking, just like the boy crying wolf all the time, and then we won't know when someone is about to hit us at an intersection. Well, two points, Your Honor. If we were to get rational basis review, and all that was required was some rational, some plausible rationale, that might suffice. But as a First Amendment, there must be evidence proving the harm. From legislative findings to case law for record evidence, in well over a century of automotive history, defendants could not cite, produce, or document from any source a single fact, documenting a single accident, hazard, or close call ever caused by horn use. But still we have these kind of statutes in most places, and so if they're working, then people are paying attention to horn use when there's an actual hazard, and otherwise we're not being distracted by horns all the time. And if that's the world we're in, maybe you disagree that's the world we're in, but if it is, then how would we have evidence of an accident caused by horn use? Well, horns are used all the time. The statute allows them to be used all the time. Yeah, but they're very different sounds. I mean, a car alarm does not sound like someone honking because you're about to have an accident at an intersection. Well, I will assume that it's possible that defendants showed that their interests were jeopardized. That gets us to neighborhood tailoring. I just have a question. Yes, Your Honor. I think the answer to your question is that we all know, and the records just show that this statute is barely enforced. I mean, it is enforced extremely rarely, and we all live in the world, and we know that people are honking for other reasons all the time. You know, they're not going driving around and just driving down the street and honking, because why would they? There's no reason to. But in terms of whether there's any enforcement of the notion that you can't honk to call your, you know, get somebody to come out of the house or greet your friend or anything, it's just not enforced. Does that tell you something about the threats of the state's interest? Yes, it does, Your Honor. I think that's entirely appropriate that the state does not, you know, enforce this routinely. It does enforce it sufficiently. It's originally effective, but it is not enforced thousands and thousands of times a day. I don't know how much the number was, like 80 times or something. BHP enforced it. Over a period of about five years, both agencies, I think, accumulated a total of about 500 or so over a period of time. Do we have any idea how that compares to running a stop sign? That was not developed as a record, Your Honor. I mean, a lot of people run stop signs, and they don't get tickets, right? But we still have a rule, and we still think there's a risk of running a stop sign. So it's hard to know whether that's an abstract, like a lot or not a lot. That's true, Your Honor. Two points, if I may. You know, the record and case law show expressive ordinance is ubiquitous, regardless of what the statute says. And there's been not a single factional, single accident. And the District Court in Madera, in Michigan, looked at a case specifically where there had been a vigil running for five years and over thousands of expressive ordinance. And not a single accident resulted. So we have a real-world example documenting that expressive ordinance did not, in fact, cause the harm alleged by the defendant. Sorry, where was this vigil? This was in Michigan, in Nicoderican City, for a nail case that is discussed in the briefs. One of my concerns is that if you win, and people can hug kind of at any protest at any time, that cities that are giving permits for protests will move them away from intersections so that people aren't hopping and causing traffic problems at intersections. At that point, if you stick your vigil out into the corner of the town where no one is, it actually defeats your speech purpose. And so I'm not sure that any response to that concern. Well, that would require a factual showing that expressive ordinance, in fact, caused the alleged harms. And if it did cause the alleged harms, there would be evidence of that fact, and the district court would be able to tell that it did not. The testimony is there. Isn't it reasonable to worry that if people are hopping all the time at an intersection, that if there actually is someone who is about to hit someone in a crosswalk, no one is ever going to know that that hop is going to come through? I mean, that's just intuitive, isn't it? Well, reasonable people can tell the difference between different kinds of hops in contact. If you're at an intersection, how does a protest, and also someone is taking too long in the crosswalk and is about to get hit by someone turning and you're trying to hop to tell them, how are you going to tell the difference? Well, there is expressive ordinance varies by frequency, duration, and volume. And, you know, it stands to reason that a person alerting someone to danger is going to sound louder and longer than feet need to support the protest. And I will also say – Let me ask you one thing. Are you arguing that there is no statute that could address this problem, or you're arguing that this was addressed, compromises more speech than is necessary, but you could write a statute that addresses the problem to which the Church of Greenland is concerned? The latter, Your Honor. So how would it look like? So as to narrow tailoring, the government has three other options and ways to address these concerns. One, it could adopt a law or amend the existing statute to target genuine distraction, genuine disturbance, genuine danger, which this does not. Perhaps that line is a policy. Could you say that protests are not giving an option to intersect? Potentially, because it is the time, place, or manner, right? It could be more narrowly tailored to time, place, or manner. We have an opinion in who the element was talked about geographically and abroad. One of the things that is made known to me is geographically and abroad. Exactly, Your Honor. I think it's directly on point in that it struck down Hermit, for example, by sound at any time. I think you should say more about who the element is. I need to narrow tailoring. It's been fully briefed and signed to the element briefs, and relied on explicitly and agree with it. And as to narrow tailoring, yes, the government can amend the existing statute or adopt a law that targets genuine distraction or disturbance. What are areas where it's more likely to be a problem? I'm sorry? What are areas where it's more likely to be a problem? That's correct. For example, a highly-dense intersection where the risk is especially high, a quiet residential that doesn't get denied. Yes, hospitals. Wait, in residential, that's correct. Why residential? It has to be publicized and generalized, right? Yes, Your Honor. That's why the other alternative as far as enforcing the peace laws and existing local noise ordinances, which contain standards, essentially denotating the First Amendment standard that excessive noise must be judged in relation to the context. The First Amendment prohibits noise-based restrictions on expression unless the noise materially substantially exceeds the ambient sound levels of given topics. If the concern is about distracting people in traffic and watering down the effect of hearing a horn in traffic, noise isn't really the problem. I mean, it's not the volume, really. It's the reaction that you have, whether a horn is rare and wakes you up or not. So how are you going to write the statute? Can you tell me? I think you started it. There is a model that I've addressed in the briefs. A horn should not be used in a way that genuinely distracts other drivers or genuinely disturbs the peace. But isn't that just going to be content-based again? Like if you're honking by the protest, you're going to say, well, I wasn't distracting, and we're going to be back in the same problem. I don't really understand how that gets better. It's content-neutral, Your Honor, because it does not depend on the subject matter of the expressive conduct. In other words, if the honking is genuinely dangerous. Yeah, but who decides that? How do we know? It doesn't have to depend on whether you're trying to – I mean, you say you can tell the difference between the honking and the protest or not, so then we're back in content-based about whether it's genuinely distracting or actually doing something else, right? Respectfully, Your Honor, it's not content-based because the enforcement does not depend on the message. The existing statute depends on the process. An officer must evaluate conditions on the road to decide whether a horn honking was reasonably necessary to give a warning in front of them. And if you're trying to figure out whether it's distracting when you have to do the exact same thing, was there a real hazard here that made this appropriate or some other condition that made it appropriate in that you're looking at the communication again? Well, you're looking at the effect of the communication, regardless of its subject matter. So regardless of whether I'm giving a warning or I'm supporting a protest or I'm greeting a friend or a neighbor or I'm supporting a local charity or supporting the firefighters who are standing out raising money by the side of the road, regardless of what message is – regardless of the subject matter or the communicative content of that message, the issue in a content-neutral statute would be, does that genuinely distract, disturb, or endanger? In the same way we have – there are cases I've cited in the briefs where we have enforcement of noise controls at protests that substantially disrupt the operations, let's say, of a health care clinic indoors. And what that issue there is not the message to the protesters. The issue is not whether the protesters are supporting or opposing, let's say, abortion or other forms of health care. The issue is whether the sound level substantially disrupts. And that would be the case. So you're at an intersection. There's a protest. You honk. Is it – say your words again. Does it meet that statute or not meet that statute? Look, if, in context, that particular honking created a substantial danger, then that could be regulated. But I don't think it should be said across the board, in all circumstances, regardless of time, place, and measure, that all its support is necessarily creating danger. In one of the cases, there was a Better New Mexico statute. And the New Mexico statute was more peculiarized. What did it say? It said no person shall use a horn in such a way as to distract other drivers from the scope of peace. And I just don't understand how that can be enforced without looking at the content either. I mean, I have the same questions about that. A lot of what I was just asking you about, the one you articulated, sounds very similar. I don't know how you know whether something is appropriate or distracting without looking at the context and the communication that it's trying to make. We look at the context, but not the substantive subject matter of the expressive conduct. So, again, if I'm protesting outside of a clinic or on a street preaching at a public market or a forum. And we're talking about honking, though. Make your example be about honking, please. If I'm honking and I want to support the protest, but I stand on the horn so long and so loud that I disrupt the surroundings or I create a genuine danger, that can be enforced against me, even though regardless of the content of the message, the issue becomes the decibel level and the duration and the length of time that I'm talking. It's not about the message I'm conveying. It becomes about the manner in which I'm conveying it. But if you do that, then we're back to, like, can you hear me in a quiet place or not quiet place? That's true of all disturbing the peace laws and all noise controls. The First Amendment does not allow restrictions on noise, noise-based restrictions on expression unless they're substantially beyond the ambient sound level. So all of these rules do depend on context. What is substantially disrupting the operation of the health care clinic? What is disturbing the peace at the forum perspective? These are all examples from case in front. So tell us specifically about that. When we're in a disaster, and it's just a noisy place to begin with, so why would they do that? That's exactly right. Cuviello struck down a restriction on amplified sound or permit requirements for amplified sound because it was, in essence, not nearly tailored. It was way overbroad to the city's legitimate needs because it was largely because locations there, at a particular location where there's a big forest that's just thick slags and it was very noisy. That's right. It contrasted that to other times and other places. So a child's birthday party in a park at noon versus a quiet residential area at midnight. And so, yes, the city could have… I don't understand this quiet residential neighborhood at midnight. I mean, she hung out more than a particular incident. I think 14 or 15 times. That had them complaints from the Neighborhood Residential Association about the noise from these protests in general, which her hogging them more than 14 or 15 times contributed to mayhem rights as well. And she was participating in a protest. The only reason she got in her car was because she was parked illegally to begin with when it had a fire hydrant and she thought she would get a tick. So instead of she'd want fuel from the protest, got into her car and started hogging them more than 14 or 15 times. That's a noise problem that disturbs a residential neighborhood, whether it occurs to me at 6 o'clock, 7 o'clock, or midnight. And it may depend on whether you want to go to sleep. In fact, the Supreme Court has recognized the special interest of people and joy from that kind of interference in their own home. Yes, Your Honor, go ahead. There is a noise factor here as well that you're passing over. Well, if I may, Your Honor, two points. First, on the record, and second, on the law. On the record, this protest was one hour a week. And the vast bulk of the noise from this protest did not come from horn hogging. It came from loudspeakers of counterprotesters. And the neighbors did complain about noise, but they did not specifically complain about horn use. The protest itself was quite loud. And the city did not exercise its noise control enforcement powers. The City of Vista had a noise control ordinance. They elected not to enforce it against the protest, which leads to my point about the law. There are laws that do restrict genuinely excessive noise that disturbs the peace. And our position is those are a more narrowly tailored alternative to an across-the-board ban in all circumstances, regardless of time, place, and volume. And so, yes, the city and the county or the state retain abundant law enforcement resources to address genuinely disturbing noise. And I've cited cases in the briefs where jurisdictions have been allowed, courts have upheld the right of jurisdictions to enforce these kinds of disturbing the peace laws against genuinely disturbing noise, while also allowing for expression, that is, within the ambient set of levels, generally speaking, and not genuinely disturbing or genuinely endangering public safety. And I'm going to ask one more. Can I ask one more question? As I understand it, the horn honking is mandated by state law. That is, you have to honk, as the first clause of the 2701 says, you have to honk when there's substance to prevent injury or death. You have to do that. Otherwise, it bans oral honking. So it's not based on content. It creates an exception only where the state has mandated that a driver use the horn. Your Honor, I just want to be sure so that I can focus on what the analysis is. This is not a content-based form of discrimination against content-based speech, I should say. But, Your Honor, our position is that it's content-based under Reed and Godear. I'll stand on the briefs on that, which I've addressed that in the briefs at length. Very briefly, the statute does require the giving of one message on the one topic, but it expressly prohibits using a horn to give a message on any other topic. And under Godear and the principles announced in Reed, our position is that that is content-based because it also has to decide what message is being expressed. But is that really a message? It's a noise. It's your state. It is to wake you up. It doesn't say what's happening. It doesn't tell you. It just says, actually. It doesn't say anything. It's just a way of getting people to look around. If I may, Your Honor, I don't want to dwell too long, so I do think we prevail, even if it's content neutral. But just very briefly, if I am walking down the street and I see someone about to jump in front of a passing car and say, stop, watch out, step back, that's a message. I've delivered a message of warning. If I honk my horn to do the same thing, that is the same message understood in context, delivered by different means. So I do believe it's content-based, but we don't have to prevail on that. Stop. When you go down to see somebody walking down the street and you say, stop, you are, that's a particularized message. When you honk, nobody knows whether you're saying something is walking down the street or that there's traffic up ahead or that there's, you don't know what you're saying. You're just saying it. Most are saying it's content-based. Well, the statute especially requires to use the horn when it's only necessary to give warning, which presumes that people understand the warning. But in any event, I can't understand that. I can't understand that. People pick up their head and there's nothing I have to pay attention to. I don't know why I did it, but now I don't know why I did it. Well, be that as a mayor, yes, I don't need to prevail on content-based, because I do think the statute prevails on content-based scrutiny. The last file I'll make before reserving for rebuttal is, the Supreme Court decision forecloses any argument that a restriction on speech or expression is constitutional simply because it's easier to enforce than the alternatives. The point of the First Amendment is to protect freedom of expression, not the convenience of government. And so there are abundant alternatives the government may rely on to protect its legitimate interests without a near-total ban on expressive or use in all circumstances, regardless of time. So should I follow up on Jennifer's last question about this? I mean, that principle is because we want content to come out in a horn. If you honk at a protest, you don't really know if you're honking in favor of the protest or against the protest. Maybe you're like, I don't like you, I'm going to honk at you. There's no word in the horn. So can you address that and how it fits with the regular doctrine? There are many forms of expressive conduct that do not involve words from a horn. And, again, the district court found in the context of this protest and this case law has found in many other contexts that as the record itself reflects, people understand in context what a horn is being used to express a message. The test for expressive conduct is both subjective and objective. It does not require any lines between the speaker and the listener. All it requires is subjective intent to convey a message, and at great likelihood, that will be understood in context based on all the circumstantial evidence. And so, you know, the flag hoisting. Is there empirical evidence to support your last statement about what most people understand about a horn and whether what the purpose is to honk a horn for the honking? There is the record in this case, Your Honor, in which Ms. Porter drove by the protest and the protesters cheered in response. The district court found that that was expressive conduct protected by the law. But they knew her. So I have the facts here. I mean, you're speaking of forward-looking injunctions. Does it have to do that? Is that really that relevant? So do you have any other records? Well, I have abundant case law. The NL case noted a moment's reflection brings out abundant situations where people use their words to express a message well understood in context. I have a question. So back to the beginning, and then maybe we can talk, I don't know. But you can tell we're all quiet. I'm part of your community. Go back to the beginning about what an injunction would look like. If the injunction were to be limited to political protest, would that be a problem? I mean, that's an attractive option because it, therefore, takes care of a lot of the problems with regard to preserving the Boyle-Chrysler version of this. For the most part. And, on the other hand, that's built in at home. Content discrimination problems. My own view is that the whole content discrimination thing has gotten quite out of hand. It is making a lot of sense sometimes because after all, political speech, for example, is the core of the First Amendment, and one should be able to preserve that in particular without running into content discrimination. But under current doctrine, would we do that if that was the injunction? No, Your Honor, because the First Amendment prohibits restrictions on speech. So when the state or the government abridges or restricts speech based on content, that violates the First Amendment. But in order of holding free speech rights in a particular context, such as political protest, it is not an abridgment of the First Amendment. Your Honor, I think you had a suggestion that you indicated what this is exactly now, except in the case of political protest, it would be another exception for what you would hunk. And then somebody should come back and say, well, I want to hunk to tell the carpool children that it's time to come out, and why can't I do that? That's the message, too. Well, that's inherent in the nature of injunctions, but it has applied challenges to write in specific facts. So in their case, which was horrible to the individual, the district court issued an injunction protecting the right to hunk to that particular individual. The injunctions follow the scope of the evidence in the case as applied to the facts and protect the plaintiff's rights on the facts and issues before the court. If another plaintiff comes in and brings their challenge, then the court adjudicates that challenge. I agree, Your Honor, and, again, the district court could craft the remedy on remand at its discretion. A restriction as applied to the particular type of facts in this case would be an appropriate exercise of the court's equitable description to tailor the remedy to the record. I also think, as I've argued, it's also justified to say the injunction would prohibit enforcement in any expressive or abusing context. Those would be issues, I think, for the district court to address on remand, because we never got there. That would involve the enforcer, the police officer, to make a judgment about the content of the speech and what its intent was and whether or not it was political or not. I think there is, you know, I'd like to see, in writing, if possible, Your Honor, how you would word this particular injunction in a way that doesn't create all sorts of problems, including having the law enforcement officer make judgments about the purpose of the speech. Well, as I'm sure I already have done. I see you're converting, essentially. If there was a double-blinding banning on the use of horns, that would be kind of unusual. And your remedy, it seems to me, elevates this to having the law enforcement officer make judgments about the content of the speech. I think, you know, the declaratory judgment is a discretionary remedy, and so is injunctability. And it seems to me important to know what it is, and even an understanding of the substance of your argument, what is the remedy that you want, and explicitly, your brief was worded generally. As I said, Your Honor, we didn't read the remedial issues in the district court because we lost. I don't think it's possible to divorce remedial issues from the underlying complaint, because if the only remedial issues raise other problems or are unenforceable or unpractical, that may be a reason not to grant relief. Well, Your Honor, I mean, you know, the one example of not honking, she passed a sign supporting veterans. I mean, that wouldn't have been a protest to begin with. I'm not sure whether an officer would understand that as a political message that she was sending, whether she was opposing the message or whether she was supporting it. I wouldn't think of it as political, but that's my own view. But what you're suggesting now is placing a law enforcement officer in the position of not making judgments regarding the content of the speech, if you call it honking, the horned speech. Well, Your Honor. Is that the remedy you're suggesting? Our remedy is to protect freedom of expression and protect expression. I don't know how to protect freedom of expression. I mean, it's meaningless in terms of an injunction that's supposed to regulate the conduct of law enforcement officers. It was the remedy. It was the remedy. Yes, Your Honor. What would your injunction say? Your Honor, the injunction could say quite a several things, but our threshold position would be that the enforcement by the statute should be enjoined as to expressive conduct when there is a subjective intent to commit a message, and it's very likely that it's understood in context with examples drawn from the record, as Deputy Kline himself testified, that he was quite clear when people were honking their horn to celebrate a victory or support a protest. You're basically introducing a content-based remedy in which law enforcement officers would be essentially required to make judgments about the content of the horn blowing and its purpose, whether it was political speech or not. What is political speech? Is protesting the conditions of the order right now, is that political speech, or is it speech that simply relates to an issue of public policy? I don't know why you can't give it in your brief, and why you can't give us a written proposed injunction. If the court would like something I'll brief on it, I would do so. I've always understood that as more than a judge or court should address in the first instance. I understand that, but I don't think you can separate the remedy from the challenge here. That's my own view. I would like it. All right. I'm going to judge whether the panel would like to accept the presentation of the panel. I will gladly respond to your question. I'll brief you on that, make a motion if that is so appropriate. But I do think there is a clear path for the district courts to write and craft an enforceable remedy unremitted by declaratory judgment or injunctive relief upholding the right to freedom of expression in specific context following the evidence record in case law. Okay. I think we better stop you. We might issue an order asking for more after a conference. We can discuss that and see. Of course, you're always welcome to submit a letter if you think that's appropriate. Okay. I have a few minutes for a follow-up. Yeah. We'll give you a few minutes for a follow-up. So now we're obviously going to give you more time as well since we've come so far over with this item. But I'm not sure. Did Dave go first? That'd be great. We're going over. I don't think it even matters. But maybe we should just in case. Sure. It's possible that Sharon will respond to that. I'm Sharon O'Grady for Senate Respondent Amanda Ray, Commissioner of the California Highway Patrol. Good morning. In this action, plaintiffs are challenging a statute that was enacted more than a century ago governing the use of vehicle horns. It has counterparts in 40 states. It's consistent with the Vienna Convention on International Traffic. The law is directed to conduct non-speech. There's no contention that the law was adopted to suppress freedom of expression, and it makes no reference to the content of the speech. It simply restricts the use of statutorily mandated equipment that has to be loud, and it's required by law to be loud to its intended purpose, and that is to, when necessary, due to traffic conditions. Somebody is driving down the street and has a Ford and it makes noise, right? And that is exactly the same horns, right? It's attached to the car, but it pulls the bulb, and the noise comes out, and it's like a Ford-like horn. The statute doesn't apply to that, presumably. It does not. But there you have a person who has gone out and acquired a bulb horn or whatever it is, and they may be violating another law, but every single car in California is equipped with a horn capable of emitting 110 or more decibels of noise, and with the touch of a button, with the touch of their hand. And that is the reason that every single car has that, is this beam-shaped safety equipment. So, yes, there are other ways you can make noise that would be obnoxious and abusive. But the vehicle code- It has to be obnoxious and abusive. The problem is that, I mean, one of the baselines here that really bothers me is that, really, that it seems to me it has to be pitted and not finished, is that it's barely enforced. And, you know, I wish there were a record on it, but I certainly, my instinct is a lot more than going through a shop line just to make it convinced that we know that this happens all the time, we can leave the process out of it, but that people stop in front of houses and beep horns to get people to come out or drive down to the side of the street and see somebody in a double-parked car and beep. I don't know why that is safety. It's really saying, come get your car out of here because I can't park. But it's not really about safety. And a hundred other things that people use their horns for. And the degree to which that happens is not education. It doesn't have the state interest. It's, you know, something other than what it's meant to be. Well, there are a lot of laws that aren't enforced. I know that. And there's no indication that Section 2701 is enforced in an abusive manner. I mean, the record is that there's no evidence that it has ever been used to chill the feet. Why isn't it used more? There are a number of cases where people were cited. It certainly is. I mean, I tend not to be that impressed with the content discrimination issue here, but one of the explanations for the content discrimination rule as rigid as it is in Reed is that that opens up the possibility for elective prosecution or for people to be enforcing it because of the measure. So I understand the record here is that that wasn't the case. And it may often not be the case, but it still creates the possibility. There would be, at least in California, there's no indication on this record that the California Highway Patrol has ever used it in an abusive fashion. And the California Highway Patrol, to the extent they're involved in protests, are normally involved as people. Well, I mean, essentially what's happening here is that the police decided to come in and enforce a wide range of traffic laws, like putting your wheel in the right place at this, to clear out a protest, which he wasn't willing or didn't seem to have the ability to clear out directly. I mean, they couldn't come in and say, or they didn't come in and say, you know, disperse the protest. But that's essentially what they were doing, dispersing the protest. Well, there's nothing in the record that indicated that the protest was actually dispersed. I think that they were trying to address the fact that the protest was on a busy street, there were traffic concerns, and they were trying to establish some order to what was going on. But they didn't break up the protest. There's nothing in the record that indicated that they did that. There's all parts of that. That's very subversive. This is all in a public forum, and we have general rules, very restrictive rules, very protective rules about the police in a public forum, which often involve compromising traffic laws. I mean, when you read all the old public forum cases, I mean, the police are always saying, you know, well, they're eventually obstructing the streets or they're obstructing traffic, and the answer has always been the speech in a public forum. You can have timelines and matter restrictions, but you can't eliminate the speech in a public forum, even if the result for a parade, for example, or a protest is to make traffic difficulties. So that piece that is in a public forum makes it somewhat different from some of the, you know, other things expressed on contact cases. But nothing was preventing Ms. Porter from expressing her message. In fact, she did that. She always had the ability of speech and other things. All that is mentioned in this case is the noise made by her horn as she was driving down a street in which protesters were on one side of the street, anti-protesters were on the other. That's all that is going on here. I'm not saying that the police can never be abusive in a public forum, and the Highway Patrol does have, as we'll get to, a policy that when they're at protests, that their policy is to carefully weigh First Amendment rights versus public safety. So the Highway Patrol is cognizant of the First Amendment, and they do have a policy when they're involved in managing protests. They weren't at the protests. Any records of Highway Patrol officers ever slaying someone or using a horn at a protest? There's nothing in the record that indicates that they did that. That's not to say that there couldn't be a reason or it didn't happen, but the documents that were produced weren't suggestive of any, you know, there wasn't like a clump of ten citations given out on a particular day where you could go and say maybe this was for a protest. There's nothing like that. It's not enforced very often for a number of reasons, one of which is that horn honking is very transitory. In order to cite someone for it, a police officer has to be in the area, and it has to be contained enough that the officer can figure out, you know, who's doing it. But that doesn't mean it isn't an important tool. And I did want to get to the record, which is that we did put forward a record, both the testimony of Sergeant Beck on horn honking in particular, and also we submitted a number of studies that the court refused to consider that included impacts of noise both on the motor skills needed for driving and also on the real health impact of noise on communities. So we included quite a bit in the record on both of those issues. The court accepted and considered the declaration of Sergeant Beck, who had 25 years' experience. And at the time, he had declarations that he didn't say anything. For one thing, he does harp a lot on the fact that he didn't suggest it because it's easier, and I think your point is quite correct that McCollum is very hard on that notion. The efficiency notion is not, and that seems to be his real main concern, is it's just a lot easier than the alternatives. Well, I don't really think that's correct. I mean, there are alternatives of local noise ordinances for every county or city in California. But you don't judge alternatives by what exists now. You judge it by what could exist, right? In other words, the fact that you only have local sound ordinances or that the sound ordinances are not adequate, it doesn't mean that the state couldn't add statutes. For example, you can't warrant pump or legs, joints, you know, or you can't hump. I mean, one of the things that people do is after somebody has humped them off, then they hump. It's really not part of your safety purpose. It's because they're angry. You couldn't add a warrant-targeted statute that doesn't exist here, could you? I don't think it would be practical to draw the lines in that fashion or easy to do. But at this point, it doesn't have to be. I mean, that's where McCulloch and other cases are really tough. And easy to do is not a criteria. I understand that, Your Honor. But narrow tailoring doesn't require the narrowest possible tailoring. You look at whether it can be reasonably narrowed consistent with satisfying all of the requirements of the statute. And here, any narrowing would mean that there would be more noise-talking unrelated to traffic. There would be more noise with both the potential for distraction and just the environmental impact of increased noise and their effects on neighbors and other motorists. I'd like to ask about the non-enforcement. So it seems to me that the, like, crying wolf theory is your best reason for this statute. But if the statute is in discourse, how do you defend the crying wolf theory? Like, are people actually following this statute or not? Well, one of the things that Tip said at the beginning is there is an interim effect. You know, the fact that the law is there means more people obey it. And how many people can help it? It's in the driver's manual. You have to take a driver's statute to read it. But, you know, so there is an interim effect. And also, it is a tool. I mean, the Highway Patrol and law enforcement officers in general have a number of tools, and they don't use all of them all the time. They don't use this one all the time. But sometimes they're necessary. Is there anything in the record about, like, the level of knowledge of a law or the level of enforcement of a law that's necessary to create a social norm? There's nothing in the record. I mean, we argued plaintiff here did not pursue her facial challenge and her as-applied challenge related to protestantism a long time ago. And we did argue that the sporadic enforcement of the law, or at least, you know, the fact that out of 4 million, you know, citations issued in California, less than 200 were for pornography over a period of years, meant that she was not likely to be impacted by it. So the record doesn't say that. But, you know, part of the problem that I see with this case is that she doesn't want to be really specific to her. Because their case, they did not talk to the statute. They said, you cannot apply it at this visual. Right. This whole idea that she's pursuing an as-applied, I mean, it seems like both sides and the district court all had this notion that she was pursuing an as-applied challenge. But I don't understand that really being not really an as-applied challenge. It's really a facial challenge to the statute, as I understand it. She did not, she actually, we moved her summary judgment on her as-applied challenge, and she declined to address it. She didn't address the verdict. It's a facial. Sorry. Excuse me. It's a facial challenge. And she did not address it. She didn't. But, like, the way those words were being used is, like, divorced from my understanding of what those words mean. I mean, she's not, as you say, she's speaking boldly to have the squadron protest in San Diego and not have enforcement. She's speaking really in argument about content-based for the whole statute. It's not really limited to political speech. It seems like that's a facial challenge. But even if she's saying that only political speech is still statewide for all the plaintiffs, for everywhere, I mean, I, for example, plaintiffs call anyone who wants to hold their court. I don't understand how this got to be called an as-applied challenge. Well, it's because, I mean, for one thing, she briefed it as an as-applied challenge. She didn't purport to satisfy the requirements of a facial challenge. And, as I said, we moved for summary judgment both on our as-applied and facial, and she declined to address our facial. What do you wish that she did? I mean, I agree that she, you know, formally she's saying it's an as-applied challenge, but what more would she have had to show? She wouldn't have had to show that there was substantial overburdens, essentially. Right. But maybe that comes back to the enforcement problem. I don't know. I mean, the way she's arguing it, to the degree she's trying to reach all expressive speech and not just political speech, she certainly is arguing that there's substantial overburdens. Well, I mean, that's not a problem. Trying to reach all expressive speech creates not just an inconvenience but an impossible position for enforcement officers who have to address both subjective intent and whether it's readily understood by others. I mean, we can't go backwards. If we thought that hunting a horn in support for protest is protected speech in a public forum, as a general matter, and that the statute is there for regulating protected speech in public forums, you know, somewhat like, well, maybe McCulloch or some other cases, then we sort of have this dilemma, which is if you have a narrow, if you narrowly enjoy it as we were saying before, then you can come up with a content discrimination problem, i.e., you can do this for a protest but not for other purposes. And if you broadly enjoy it, then we have the problem that you're talking about, which is you can find a more legitimate statute of view when you're applying it, you know, to sort of not or First Amendment, although protected by the First Amendment, that's just like come out of your house. And at the same time, give it read and edit, you know, a more budgety approach to content discrimination, you'll end up with content discrimination. So it seems like that you're not protecting speech in a public forum in order to avoid, I mean, there's a speech in a public forum to avoid a budget discrimination problem. Nobody can get protected. That's essentially where we need to be doctrinally. Well, certainly I think that the solution of somehow exempting protesters gets you right into a problem of a content-based statute. I understand that's probably true, but it doesn't make sense in terms of what the First Amendment is really about. The First Amendment protects people's right to get their message out, but it doesn't protect their right to do it in any way they want to, including using a 110-decibel vehicle horn. That's not, you know, there's no indication in the record that she wasn't able to and did participate and get her message out at all these protests. We're talking about. But, again, if you had it all the way, you could still do it. If you had it as a whole, it would make the same noise in the same place. Well, you may get criticized for something else. But, yes, the vehicle horn is a piece of equipment, just like there are rules for lights on cars. And if you went out walking with a flashlight, you would not have to follow the vehicle code rules for that. Yes, there are ways you could get around it. But I think that the likelihood of distraction from something like that is much less than the distinctive sounds of a vehicle horn, where people jump, you know, you jump when you hear a horn sometimes. And, you know, as I said in the record, we did present evidence on distraction. We presented evidence on noise pollution and the health impacts from that. And any exemption that was carved out would increase those tables, and that's not what is required in a time-sensitive matter in health. And all of the evidence that the judge excluded was hearsay. And I assume that was being admitted to show why. It's like this is on the books. Yes. I didn't quite understand this hearsay objection. I didn't either, Your Honor. We submitted these reports, government reports and scientific studies, as legislative facts that do not require an expert to testify that they agree with what the World Health Organization says about the link between, you know, cardiac disease and road noise or the EPA's conclusions on it. We asked for them to be considered and submitted them as legislative facts that we think the court should have considered. And that actually may be evidence that the state was looking at those, though, for them to be relevant as legislative facts. No, I don't believe we do. We're not required to show legislative history. I mean, this is a law that's been on the books for 100 years. And I think everyone, I think the fact that 40 states and internationally the general rule is that there's a consensus of a need for the statute. But studies, the fact that there are numerous studies and reports and government analysis is relevant. And are there any studies to this particular problem? No. And actually, Dr. Hancock, who is the expert for the plaintiffs, testified at that position that basically it would be impossible to conduct this study or it would be very, very expensive because of the transitory nature of horn honking. He said he was, his resume was like 1,000 pages long, enormous, of what he has done. And he's an expert in the field of noise and other things and traffic. But he said you would have to, even to start the first stage of the study, to even use the baseline of what he said would be a three-part analysis, would be extremely difficult. It would cost tens of millions of dollars. So the fact that it's such a practical, the fact that there isn't that kind of study, a study that he would accept, because you basically can't do it, doesn't mean that the evil isn't real. And we actually did present two horn honking studies in evidence where they had done studies about the additive problem of horn honking in road noise. And we submitted, you know, a number of more general environmental noise, which is, you know, that road traffic presents about 50% of environmental noise. And honking, obviously to be heard, rises above the ambient road traffic. So we did present a body of support that under Supreme Court jurisprudence and the jurisprudence of this court could fairly be considered to support the law. Thank you, Counsel. It seems like we're out of questions. Do we have anything further? I don't think so. Thank you. Here you are. Yes, sir. Good morning, Your Honors. Jeff Michalowski, Superior Advocacy Assurance, Martinez. Thank you. Again, very briefly, I had a strength of the mouth question. We raised a quiet term of mouth problem in this case. Your Honor, I'd actually like to focus my discussion exclusively on MNL because there is a Supreme Court authority that says that when a party is seeking injunctive relief going forward, that the provision of MNL should attach. But only when it's doing a local government entity, right, not an individual in their official capacity. Why isn't this just an ex parte? Is he the right person or the wrong person in terms of getting as far as looking for relief? You're a sheriff, but I don't understand how MNL has to deal with it. We did not raise the ex parte issue as to the sheriff, but our understanding is that in order to obtain liabilities, the sheriffs have been having to proceed through MNL. But you're proceeding through ex parte, yeah? I mean, they sued an individual. They didn't sue the government entity, like, trustee or trustee sheriff's office or entity. MNL is about suing local government entities. Right, but the individual they sued says that the ex of the organization, effectively, is the sheriff. Now it's the acting sheriff. But it's important to tap them out to see if the entity could understand that. Well, getting the sheriff in his official capacity could bind the entity, ultimately, but the suit is against the individual. So it seems like we're under ex parte. Now we've got MNL. Well, if that's the court's position, I assume it would be looking to submit a supplemental version of MNL. Excuse me. I don't think you're going to lose, because I don't think there's any possibility that this is an ex parte problem and it's a MNL problem. And once it's ex parte, yeah, I know we're jumping to the merits that we've been talking about. I don't know that there's anything different about the merits that the sheriff has than the AGP. No, I don't think there is. I think the sheriff's position is that there's probably a steep position with respect to the constitutional issues. So I have prepared remarks regarding MNL. If this was the court, they would not be interested in hearing those remarks. But I would point out, I think the letter bringing the piece of this last week, it asked the court to take that into consideration, that would be a vaccine case in which this court, in December case, it held that when a party sends a demand letter to the entity, and the entity doesn't respond with a focus about the challenge practice, that's not going to be sufficient to get towards the entity liability. So regardless of what is perceived under MNL, that case doesn't seem constructive. And I would point the court also to- It seems like that's not relevant. There's a duty against the entity, but here there isn't. Correct. That's correct, sure. But I want to point out how problematic plaintiff's theory is here, which is that their position is that if a plaintiff sends a demand letter to the entity and has to complete an avowal, that would trigger liability for the entity, that the only thing that gets you through to the floor party is to go ahead and respond to those letters at all. And we suggest that that's not really constructive for anyone that wants these parties to be engaging and discussing. Unless there are further questions, I suppose, at this point. Thank you, counsel. Let's give four minutes for rebuttal and see if we can manage that. Thank you, Your Honors. If the actions were improperly gendered time, place, manner, or volume restriction, that would be a very different case. But this statute is across the board in all sorts of cases. And yet Ms. Porter testified specifically she silenced herself from expressing herself at protests four specific times, twice, again, in the eyes of protest, once at cross-battle, once at mission time. So there is a clear record for self-censorship in the context of protest that will support an injunction. In that context, the injunction could run broader, could run narrower. That would be something the district court could resolve for you. If she silenced, I mean, it's a very strange result because it's probably effort enforced. Because it's probably effort enforced, her chances of actually getting silenced in any of these cases was very little. Plus, if she does get silenced, what does she have? She has a traffic violation. Well, it still exerts a chilling effect on speech, as we've briefed, but it's sufficient to support standing. And I'll stay on the briefs as to that point. I would like to also address the so-called negligent record that defendants sign. To the extent there are gaps in the record, it is the defendant's burden to justify restrictions on speech or expression. So any gap in the record must be held against the party with a burden on that issue, which is here the government. Follow-up. Isn't it a little derpy to think that if there were a direction, if there was the empirical literature that was relevant here, and I don't know whether the people she's talking about are, because they seem most inattentive to particular problems, that we need to proceed in terms of, that's essentially what you're saying, that we aren't going to decide this question about the validity of the statute in terms of whatever literature there is on the problem. If there were literature, actually, in terms of jurisdiction. That would be the defendant's burden to prove it. If they didn't carry their burden, then we prevail. But what you mean by that, you're saying that we can't read these articles that are in there? So our position on the so-called studies, we do agree that it's, of course, directly related to civil, and it should not be considered. Remember Justice Breyer's comment in the violent video game case where he had, I remember, a huge appendix of all the studies that had been done, and he didn't think that he could read them. And the question is, why can't we? Well, again, that was a dissent, Your Honor. First of all, the legislative facts doctrine does not apply to sort of contested empirical issues. It applies to undisputed facts at a high level of generality, is what are conditions in the market. When we accept the legislative fact that hypothetically, really excessive noise is really bad, yes, I think we can agree that's undisputed. But that's not the issue. The issue is whether, for First Amendment purposes, is the noise generated by expression significantly in excess of ambient levels at a given time and place. And these studies do not address the specific context of expressive morbidity. Actually, I understand that the claims to be dissenting are actually unsaid, or the claims to be dissenting are actually undisturbed. Well, if they're going to address distraction, then they did not submit a single piece of evidence documenting their speculation that that could happen. And, yes, if we were in a rational basis review, that kind of speculation might apply. But under the First Amendment, is there a burden to prove that their interests are in fact jeopardizing the real world? What kind of study could they do? Could you describe what you think would be an avenue? Well, it might not have to be a scientific study. There could be anecdotal evidence. There could be examples in case law. A legislature could hold hearings and take findings and take evidence, and that could be subjected to the democratic process, the political process, and adversary testing, whether it's legislative committees or judicial hearings. They could say, yes, there is an example from, say, you know, campus police records. It doesn't have to be scientific evidence. It could be that they could do empirical research. They could consult accident reconstructionists. They could consult accident experts. Sergeant Beck had 24 years' experience as an accident investigator, did not know of a single accident in his entire career ever caused by corn use. Repeatedly admitted. Yes, you got it right. If this law is working by preventing people from honking a lot, and therefore we all wake up when we hear a honk because we're not hearing them all the time and start ignoring them, what kind of study would support that that is true? I mean, you may disagree that that's true, but say it's true for a second. What kind of study would show that? Well, Your Honor, there could be a study documenting accidents over a period of time and the causes of those accidents. There are stop sign laws. People do something to laws that run stop signs and they cause accidents. That is documented in the history, documented in case law. You know, you can go to any court, any day of the week. But if the statute is working, how would you show that? Well, they're hurting to prove that it's justified, and they would have to prove the issue is not whether the statute is working. The issue is whether auditory information causes distraction. Dr. Hancock testified typically that visual information, such as looking at a cell phone, looking at a radio, looking at a sign, that it's more likely to cause distraction than auditory information. There is evidence in the record specifically undermining their position, even though it's their work to prove it. They did not prove that auditory information exerts a significant distracting effect. Let me come up with, I mean, it does seem fairly common sense, though, if you're driving down a street and you hear a horn, you're likely to, for example, throw out your brakes because who knows what this is about, but maybe somebody's coming, right? And that could cause a problem. The issue is really, I mean, why would people, I mean, we kind of explore the universe of why people would hop that, what's what they were doing, and it seems somewhat unlikely that any of those things are going to cause the distraction. I mean, like, if people are in a waiting position, people who are in a waiting position are not going to react, you know, if they're hopping in front of somebody's house, you get somebody to come out, that's unlikely to cause somebody driving by to think there's a problem. This is audited similarly here. So it's not exactly that, I mean, another factor that would have to be fit into any analysis here would be, you know, why would people hop, you know, what are the circumstances at which people would hop for different reasons than to, for safety warnings, and what kind of dangers would they cause? It's just enormously complicated. Well, that's why the government's burden to justify restriction on expression. We've cited a number of cases in analogous context where restrictions on speech in traffic medians, and the cities asserted that people would stand in traffic medians, sort of on the median between the lanes to travel, and in several cases in various circuits, striking those down, and the cities all argued with common sense, if we said pedestrians stand in a median, they're more likely to call the hazard or be harmed, and the courts uniformly said when a First Amendment interest is to express a conduct or speech, we can't just depend on common sense. So why don't we go back to our position about what exactly the injunctions look like here. So in a median case, is the injunction that you can be in the median for speech, or that the median statute is just no good? That you cannot, the statute could not be enforced as to speech, but if someone were sleeping in the median, or simply camping in the median, or doing something that did not invoke the First Amendment, then, yes, perhaps it could be validly applied, because, again, the First Amendment is not triggered until or unless there's speech or expressive conduct. So the ordinance could not be enforced against the speech or expressive conduct. It might validly be enforced against things that did not involve speech or clearly understood expressive conduct. So when we get to the idea of common sense, as I've explained in the briefs, common sense alone is not enough to sustain a restriction on speech or expression, because that is tantamount to saying we evaluate speech and expression prohibitions under rational basis review, and the First Amendment prohibits the application of rational basis review to protect speech or expression. You'll see that I cut you off at this point because we've gone way over. Thank you, Council. Thank you both. That was a very helpful argument. This case is submitted. I think we should take a five-minute break. And I apologize to Council and the other cases. This case went for so long I should have made it last on the calendar, and I apologize for not doing that. Hopefully we'll stick to the time that's going forward, but let's take a five-minute break and then resume. Thank you.
judges: BERZON, FRIEDLAND, Korman